STOCK PURCHASE AGREEMENT

BETWEEN

FUELSTREAM, INC.
(as Buyer)

AND

SEAN WAGNER
(as Seller)

December 14, 2011

**COURT EXHIBIT**

CASE NO. 13-80162-CR-HURLEY

EXHIBIT NO. 1

# STOCK PURCHASE AGREEMENT

This Stock Purchase Agreement (this "Agreement") is entered into as of the 14th day of December, 2011, by and between Fuelstream, Inc., a Delaware corporation ("*Buyer*"), and Sean Wagner, a resident of the State of Florida ("*Seller*"). Buyer and Seller are referred to collectively herein as the "*Parties*."

Seller owns all of the outstanding capital stock of Aviation Fuel International, Inc., a Florida corporation ("*AFI*").

This Agreement contemplates a transaction in which Buyer will purchase from Seller, and Seller will sell to Buyer, all of the outstanding capital stock of AFI in return for Fuelstream Shares and a Note, subject to certain representations, warranties and covenants by the Parties.

Now, therefore, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, and covenants herein contained, the Parties agree as follows.

1.  *Definitions.*

"*Accredited Investor*" has the meaning set forth in Regulation D promulgated under the Securities Act.

"*Adverse Consequences*" means all actions, suits, proceedings, hearings, investigations, charges, complaints, claims, demands, injunctions, judgments, orders, decrees, rulings, damages, dues, penalties, fines, costs, amounts paid in settlement, Liabilities, obligations, Taxes, Liens, losses, expenses, and fees, including court costs and reasonable attorneys' fees and expenses.

"*Affiliate*" means, with respect to any Party, any Person that controls, is controlled by, or is under common control, with such Party.

"*AFI*" has the meaning set forth in the preface above.

"*AFI Material Contracts*" has the meaning set forth in §4(n) below

"*AFI Share*" means any share of the common stock, par value $0.____ per share, of AFI.

"*Applicable Rate*" means the corporate base rate of interest publicly announced from time to time by Wells Fargo Bank, N.A., plus two percent (2%) per annum.

"*Basis*" means any past or present fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction that forms or could form the basis for any specified consequence.

"*Buyer*" has the meaning set forth in the preface above.

"*Closing*" has the meaning set forth in §2(c) below.

"*Closing Date*" has the meaning set forth in §2(c) below.

"*Confidential Information*" means any information concerning the businesses and affairs of AFI, including but not limited to, Intellectual Property, proprietary purchasing, selling, or trading methods, strategies or programs, computer algorithms, formulas, or techniques, purchase, sale, execution, or hedging methods, or any other information concerning AFI and its operations that is not already generally available to the public.

"*Covenant Period*" has the meaning set forth in §5(c) below.

"*Escrow Agent*" means Kenneth I. Denos, P.C., a Utah professional corporation.

"*Escrow Agreement*" has the meaning set forth in §2(b) below.

"*Financial Statements*" has the meaning set forth in §4(g) below.

1

"*Fuelstream Shares*" means any share of common stock of the Buyer, par value $0.0001 per share.

"*Indemnified Party*" has the meaning set forth in §7(c) below.

"*Indemnifying Party*" has the meaning set forth in §7(c) below.

"*Intellectual Property*" means: (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications, and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions, and reexaminations thereof, (b) all trademarks, service marks, trade dress, logos, slogans, trade names, corporate names, Internet domain names, and rights in telephone numbers, together with all translations, adaptations, derivations, and combinations thereof and including all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith, (c) all copyrightable works, all copyrights, and all applications, registrations, and renewals in connection therewith, (d) all mask works and all applications, registrations, and renewals in connection therewith, (e) all trading, hedging, or execution strategies, trading programs, computer algorithms, trade secrets, and confidential business information (including ideas, research and development, know-how, formulas, techniques, processes, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals), (f) all computer software (including source code, executable code, data, databases, and related documentation), (g) all advertising and promotional materials, (h) all other proprietary rights, and (i) all copies and tangible embodiments thereof (in whatever form or medium).

"*Knowledge*" means actual knowledge after reasonable investigation.

"*Leased Real Property*" means all leasehold or subleasehold estates and other rights to use or occupy any land, buildings, structures, improvements, fixtures, or other interest in Real Property held by AFI.

"*Leases*" means all leases, subleases, licenses, concessions and other agreements (written or oral), including all amendments, extensions, renewals, guaranties, and other agreements with respect thereto, pursuant to which AFI or its Predecessor-in-Interest holds any Leased Real Property, including the right to all security deposits and other amounts and instruments deposited by or on behalf of AFI thereunder.

"*Liability*" means any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due), including any liability for Taxes.

"*Lien*" means any mortgage, pledge, lien, encumbrance, charge, or other security interest.

"*Material Adverse Effect*" or "*Material Adverse Change*" means any effect or change that would be materially adverse to the business, assets, condition (financial or otherwise), operating results, operations, or business prospects of AFI, or on the ability of Seller to consummate timely the transactions contemplated hereby.

"*Maturity Date*" has the meaning set forth in §2(b)(ii) below.

"*Most Recent Balance Sheet*" means the balance sheet contained within the Most Recent Financial Statements.

"*Most Recent Financial Statements*" has the meaning set forth in §4(g) below.

"*Most Recent Fiscal Month End*" has the meaning set forth in §4(g) below.

"*Most Recent Fiscal Year End*" has the meaning set forth in §4(g) below.

"*Note*" has the meaning set forth in §2(b)(ii) below.

"*Ordinary Course of Business*" means the ordinary course of business consistent with past custom and practice (including with respect to quantity and frequency).

"*Party*" has the meaning set forth in the preface above.

"*Person*" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, any other business entity, or a governmental entity (or any department, agency, or political subdivision thereof).

"*Predecessor-in-Interest*" means Aviation Fuel, Inc., a Florida corporation.

"*Principal Amount*" has the meaning set forth in §2(b)(ii) below.

"*Purchase Price*" has the meaning set forth in §2(b) below.

"*Real Property*" means all land, together with all buildings, structures, improvements, and fixtures located thereon, including all electrical, mechanical, plumbing and other building systems, fire protection, security and surveillance systems, telecommunications, computer, wiring, and cable installations, utility installations, water distribution systems, and landscaping, together with all easements and other rights and interests appurtenant thereto.

"*Securities Act*" means the United States Securities Act of 1933, as amended.

"*Seller*" has the meaning set forth in the preface above.

"*Subsidiary*" means, with respect to any Person, any corporation, limited liability company, partnership, association, or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof or (ii) if a limited liability company, partnership, association, or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons own a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director or general partner of such business entity (other than a corporation).

"*Tax*" or "*Taxes*" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not and including any obligations to indemnify or otherwise assume or succeed to the Tax liability of any other Person.

"*Tax Return*" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"*Third Party Claim*" has the meaning set forth in §7(c) below.

3

2. *Purchase and Sale of AFI Shares.*

(a) *Basic Transaction.* On and subject to the terms and conditions of this Agreement, Buyer hereby purchases from Seller, and Seller hereby sells to Buyer, all of his AFI Shares for the consideration specified below in this §2.

(b) *Purchase Price.* Upon execution of this Agreement, Buyer shall issue the following and shall deposit the same with the Escrow Agent (collectively, the *"Purchase Price"*):

(i) Seven Million Four Hundred Thousand (7,400,000) Fuelstream Shares; and

(ii) A promissory note, substantially in the form attached hereto as Exhibit "A" (*"Note"*) with the following terms:

(A) principal amount of one million dollars ($1,000,000) (*"Principal Amount"*);

(B) maturity date of one (1) year from the Closing (*"Maturity Date"*);

(C) interest on all principal outstanding at the rate of eight percent (8%) per annum;

(D) principal payments of $250,000 each on a quarterly basis commencing ninety days from the Closing Date; and

(E) any remaining principal or interest payable (together with the final quarterly installment of $250,000) on the Maturity Date.

At Closing, the Escrow Agent shall deliver the Purchase Price to the Seller in accordance with this Agreement and the Escrow Agreement among Buyer, Seller, and the Escrow Agent attached hereto.

(c) *Closing.* The closing of the transactions contemplated by this Agreement (the *"Closing"*) shall take place at the offices of counsel to the Buyer, commencing at 9:00 a.m. local time on the first business day following the satisfaction or waiver of all conditions to the obligations of the Parties to consummate the transactions contemplated hereby or such other date as Buyer and Seller may mutually determine (the *"Closing Date"*). It is contemplated that the closing documents will be exchanged via overnight courier to the Escrow Agent, who shall disburse to the appropriate party, such documents and consideration as contemplated herein and in respect of any such agreements entered into contemporaneously herewith.

(d) *Deliveries at Closing.* At the Closing, (i) Seller will deliver to Buyer the various certificates, instruments, and documents referred to in §6(a) below, (ii) Buyer will deliver to Seller the various certificates, instruments, and documents referred to in §6(b) below, (iii) Seller will deliver to Buyer stock certificates representing all of his AFI Shares, endorsed in blank or accompanied by duly executed assignment documents, and (iv) Buyer will deliver to Seller the consideration specified in §2(b) above.

3. *Representations and Warranties Concerning Transaction.*

(a) *Seller's Representations and Warranties.* Seller represents and warrants to Buyer that the statements contained in this §3(a) are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date.

(i) *Authorization of Transaction.* Seller has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder. This Agreement constitutes the valid and legally binding obligation of Seller, enforceable in accordance with its terms and conditions. Seller does not need to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any government or governmental agency in order to consummate the transactions contemplated by this Agreement.

(ii) *Non-contravention.* Neither the execution and the delivery of this Agreement, nor the consummation of the transactions contemplated hereby, will (A) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which Seller is subject, (B) conflict with,

4

result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which Seller is a party or by which he is bound or to which any of his assets is subject, or (C) result in the imposition or creation of a Lien upon or with respect to the AFI Shares.

   (iii) *Brokers' Fees.* Seller does not have any Liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement.

   (iv) *Investment.* Seller (A) understands that the Fuelstream Shares have not been, and will not be, registered under the Securities Act, or under any state securities laws, and are being offered and sold in reliance upon federal and state exemptions for transactions not involving any public offering, (B) is acquiring the Fuelstream Shares solely for Seller's own account for investment purposes, and not with a view to the distribution thereof, (C) is a sophisticated investor with knowledge and experience in business and financial matters, (D) has received certain information concerning the Buyer and has had the opportunity to obtain additional information as desired in order to evaluate the merits and the risks inherent in holding the Fuelstream Shares, (E) is able to bear the economic risk and lack of liquidity inherent in holding the Fuelstream Shares, and (F) is an "accredited investor" as such term is defined pursuant to Regulation D promulgated under the Securities Act.

   (v) *AFI Shares.* Seller holds of record all of the AFI Shares, free and clear of any restrictions on transfer (other than any restrictions under the Securities Act and state securities laws), Taxes, Liens, options, warrants, purchase rights, contracts, commitments, equities, claims, and demands. Seller is not a party to any option, warrant, purchase right, or other contract or commitment that could require Seller to sell, transfer, or otherwise dispose of any capital stock of AFI (other than this Agreement). Seller is not a party to any voting trust, proxy, or other agreement or understanding with respect to the voting of any capital stock of AFI.

  (b) *Buyer's Representations and Warranties.* Buyer represents and warrants to Seller that the statements contained in this §3(b) are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date.

   (i) *Organization of Buyer.* Buyer is a corporation duly organized, validly existing, and in good standing under the laws of the State of Delaware.

   (ii) *Authorization of Transaction.* Buyer has full power and authority (including full corporate power and authority) to execute and deliver this Agreement and to perform its obligations hereunder. This Agreement constitutes the valid and legally binding obligation of Buyer, enforceable in accordance with its terms and conditions. Except for certain disclosure requirements of Buyer pursuant to the Securities Exchange Act of 1934, Buyer need not give any notice to, make any filing with, or obtain any authorization, consent, or approval of any government or governmental agency in order to consummate the transactions contemplated by this Agreement. The execution, delivery, and performance of this Agreement and all other agreements contemplated hereby have been duly authorized by Buyer.

   (iii) *Non-contravention.* Neither the execution and the delivery of this Agreement, nor the consummation of the transactions contemplated hereby, will (A) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which Buyer is subject or any provision of its charter, bylaws, or other governing documents or (B) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which Buyer is a party or by which it is bound or to which any of its assets is subject.

(iv)     *Brokers' Fees.* Buyer has no Liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement for which Seller could become liable or obligated.

(v)     *Investment.* Buyer is not acquiring the AFI Shares with a view to or for sale in connection with any distribution thereof within the meaning of the Securities Act.

4.    *Representations and Warranties Concerning AFI.* Seller represents and warrants to Buyer that the statements contained in this §4 are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date.

(a)     *Organization, Qualification, and Corporate Power.* AFI is duly organized, validly existing, and in good standing under the laws of the State of Florida. AFI is duly authorized to conduct business and is in good standing under the laws of each jurisdiction where such qualification is required. AFI has full corporate power and authority and all licenses, permits, and authorizations necessary to carry on the businesses in which it is engaged and to own and use the properties owned and used by it. Seller has delivered to Buyer correct and complete copies of the charter and bylaws of AFI (as amended to date). The minute books (containing the records of meetings of the stockholders, the board of directors, and any committees of the board of directors), the stock certificate books, and the stock record books of AFI is correct and complete. AFI is not in default under or in violation of any provision of its charter or bylaws.

(b)     *Capitalization.* The entire authorized capital stock of AFI consists of _____ AFI Shares, of which _____ AFI Shares are issued and outstanding and _____ AFI Shares are held in treasury. All of the issued and outstanding AFI Shares have been duly authorized, are validly issued, fully paid, and non-assessable, and are held of record by Seller. There are no outstanding or authorized options, warrants, purchase rights, subscription rights, conversion rights, exchange rights, or other contracts or commitments that could require AFI to issue, sell, or otherwise cause to become outstanding any of its capital stock. There are no outstanding or authorized stock appreciation, phantom stock, profit participation, or similar rights with respect to AFI. There are no voting trusts, proxies, or other agreements or understandings with respect to the voting of the capital stock of AFI.

(c)     *Non-contravention.* Neither the execution and the delivery of this Agreement, nor the consummation of the transactions contemplated hereby, will (i) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which AFI is subject or any provision of the charter or bylaws of AFI or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which AFI is a party or by which it is bound or to which any of its assets is subject (or result in the imposition of any Lien upon any of its assets). AFI does not need to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any government or governmental agency in order for the Parties to consummate the transactions contemplated by this Agreement.

(d)     *Brokers' Fees.* AFI does not have any Liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement.

(e)     *Assets.* AFI has good and marketable title to, or a valid leasehold interest in, the properties and assets used by it (including, but not limited to, the AFI Acquired Assets), located on its premises, or shown on the Most Recent Balance Sheet or acquired after the date thereof, free and clear of all Liens, except for properties and assets disposed of in the Ordinary Course of Business since the date of the Most Recent Balance Sheet.

(f)     *Subsidiaries.* There are no Subsidiaries of AFI.

(g)     *Financial Statements.* Seller has provided to Buyer the following financial statements (collectively the "*Financial Statements*"): (i) unaudited balance sheets and statements of income, changes in stockholders' equity, and cash flow for AFI and its Predecessor-in-Interest as of and

6

for the fiscal year ended December 31, 2009 and as of and for the fiscal year ended December 31, 2010 (the "*Most Recent Fiscal Year End*"); and (ii) unaudited consolidated and consolidating balance sheets and statements of income, changes in stockholders' equity, and cash flow for AFI and its Predecessor-in-Interest (the "*Most Recent Financial Statements*") as of and for the nine months ended September 30, 2011 (the "*Most Recent Fiscal Month End*"). The Financial Statements (including any notes thereto) have been prepared in accordance with generally accepted accounting principles applied on a consistent basis throughout the periods covered thereby, present fairly the financial condition of AFI and its Predecessor-in-Interest as of such dates and the results of operations of AFI and its Predecessor-in-Interest for such periods, are correct and complete, and are consistent with the books and records of AFI (which books and records are correct and complete).

(h) *Audit of AFI Financial Statements.* Neither Seller nor any employee or contractor of AFI with responsibility concerning the recordation or production of Financial Statements of AFI or its Predecessor-in-Interest, have Knowledge of any reason why the Financial Statements of AFI and its Predecessor-In-Interest may not be given an unqualified audit, save any qualification relating to AFI's business as a going concern, within seventy five (75) days of the Closing Date.

(i) *Events Subsequent to Most Recent Fiscal Year End.* Since the Most Recent Fiscal Year End, there has not been any Material Adverse Change. Without limiting the generality of the foregoing, since that date:

(i) AFI has not sold, leased, transferred, or assigned any of its assets, tangible or intangible, other than for a fair consideration in the Ordinary Course of Business;

(ii) no party has accelerated, terminated, modified, or cancelled any agreement, contract, lease, or license (or series of related agreements, contracts, leases, and licenses) involving more than $250,000 to which AFI is a party or by which it is bound;

(iii) there have been no Liens imposed upon any of the assets of AFI (including the AFI Acquired Assets), whether tangible or intangible;

(iv) AFI has not issued any note, bond, or other debt security or created, incurred, assumed, or guaranteed any indebtedness for borrowed money or capitalized lease obligation either involving more than $100,000 singly or $250,000 in the aggregate;

(v) there has been no change made or authorized in the charter or bylaws of AFI;

(vi) AFI has not issued, sold, or otherwise disposed of any of its capital stock, or granted any options, warrants, or other rights to purchase or obtain (including upon conversion, exchange, or exercise) any of its capital stock;

(vii) AFI has not declared, set aside, or paid any dividend or made any distribution with respect to its capital stock (whether in cash or in kind) or redeemed, purchased, or otherwise acquired any of its capital stock;

(viii) AFI has not made any loan to, or entered into any other transaction with, any of its directors, officers, and employees outside the Ordinary Course of Business;

(ix) there has not been any other material occurrence, event, incident, action, failure to act, or transaction outside the Ordinary Course of Business involving AFI; and

(x) AFI has not committed to any of the foregoing.

(j) *Undisclosed Liabilities.* AFI does not have any Liability (and there is no Basis for any present or future action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand against any of them giving rise to any Liability), except for (i) Liabilities set forth on the face of the Most Recent Balance Sheet (rather than in any notes thereto) and (ii) Liabilities which have arisen after the Most Recent Fiscal Month End in the Ordinary Course of Business (none of which results from, arises out of, relates to, is in the nature of, or was caused by any breach of contract, breach of warranty, tort, infringement, or violation of law).

(k) *Tax Matters.*

7

(i) AFI has filed all Tax Returns that it was required to file under applicable laws and regulations. All such Tax Returns were correct and complete in all respects and have been prepared in substantial compliance with all applicable laws and regulations. All Taxes due and owing by AFI (whether or not shown on any Tax Return) have been paid.

(ii) AFI has withheld and paid all Taxes required to have been withheld and paid in connection with any amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party.

(iii) Seller has provided to Buyer copies of AFI's tax returns (and the tax returns of AFI's Predecessor-in-Interest) for the two fiscal years ended prior to the Closing Date.

(l) *Real Property*. AFI does not own or hold any interest in Real Property except for Leased Real Property, and Seller has delivered to Buyer a copy of each Lease document to which AFI or its business operations is subject. With respect to any such Lease, such Lease is legal, valid, binding, enforceable and in full force and effect and the transactions contemplated by this Agreement do not require the consent of any other party to such Lease and will not result in a breach of or default under such Lease, and will not otherwise cause such Lease to cease to be legal, valid, binding, enforceable and in full force and effect on identical terms following the Closing.

(m) *Intellectual Property*. AFI owns and possesses or have the right to use pursuant to a valid and enforceable, written license, sublicense, agreement, or permission all Intellectual Property necessary for the operation of the business of AFI as presently conducted. AFI has not interfered with, infringed upon, misappropriated, or otherwise come into conflict with any Intellectual Property rights of third parties. AFI's Predecesssor-in-Interest has no Intellectual Property Rights that have not been sold or otherwise transferred to AFI, free and clear of all Liens.

(n) *Contracts*. Seller has delivered to Buyer (or shall deliver prior to Closing) the following contracts and other agreements to which AFI is a party (collectively, the "*AFI Material Contracts*"):

(i) any agreement (or group of related agreements) for the lease of personal property to or from any Person providing for lease payments in excess of $50,000 per annum;

(ii) any agreement concerning a partnership or joint venture;

(iii) any agreement concerning the purchase or sale (or the facilitation of a purchase or sale) of fuel or other commodities;

(iv) any agreement involving or providing insurance in connection with the assets, operations, employees, or principals of AFI;

(v) any agreement (or group of related agreements) under which it has created, incurred, assumed, or guaranteed any indebtedness for borrowed money, or any capitalized lease obligation, in excess of $100,000 or under which it has imposed a Lien on any of its assets, tangible or intangible;

(vi) any agreement with Seller or his Affiliates (other than AFI);

(vii) any profit sharing, stock option, stock purchase, stock appreciation, deferred compensation, severance, or other plan or arrangement for the benefit of its current or former directors, officers, and employees;

(viii) any agreement for the employment of any individual on a full-time, part-time, consulting, or other basis providing annual compensation in excess of $120,000 or providing severance benefits;

(ix) any agreement under which it has advanced or loaned any amount to any of its directors, officers, and employees outside the Ordinary Course of Business;

(x) any agreement under which the consequences of a default or termination could have a Material Adverse Effect;

8

(o)     *Litigation.* AFI is not (i) subject to any outstanding injunction, judgment, order, decree, ruling, or charge or (ii) a party to any action, suit, proceeding, hearing, or investigation of, in, or before any court or quasi-judicial or administrative agency of any federal, state, local, or foreign jurisdiction or before any arbitrator, other than those matters listed in Exhibit "B" attached hereto. A copy of all pleadings related to such matters shall be made available to Buyer upon request.

(p)     *Employees.* To the Knowledge of any of Seller and the directors and officers (and employees with responsibility for employment matters) of AFI, no executive, key employee, or group of employees has any plans to terminate employment with AFI.

(q)     *Employee Benefits.* Seller has provided to Buyer (or shall provide prior to Closing) all agreements or plans requiring AFI to contribute to any pension, retirement, health, or other employee benefit plan.

(r)     *Disclosure.* The representations and warranties contained in this §4 do not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements and information contained in this §4 not misleading.

5.     *Post-Closing Covenants.* The Parties agree as follows with respect to the period following the Closing.

(a)     *General.* In case at any time after the Closing any further action is necessary to carry out the purposes of this Agreement, each of the Parties will take such further action (including the execution and delivery of such further instruments and documents) as any other Party reasonably may request, all at the sole cost and expense of the requesting Party (unless the requesting Party is entitled to indemnification therefor under §7 below). Seller acknowledges and agrees that from and after the Closing Buyer will be entitled to possession of all documents, books, records (including Tax records), agreements, and financial data of any sort relating to AFI.

(b)     *Confidentiality.* Seller will treat and hold as such all of the Confidential Information, refrain from using any of the Confidential Information except in connection with this Agreement, and deliver promptly to Buyer or destroy, at the request and option of Buyer, all tangible embodiments (and all copies) of the Confidential Information which are in his or its possession. The foregoing shall not apply to any Confidential Information which is generally available to the public immediately prior to the time of disclosure unless such Confidential Information is so available due to the actions of Seller.

(c)     *Covenant Not to Compete.*

(i)     *Covenant.* Seller agrees that, during the ten (10) year period following the Closing Date (the "*Covenant Period*"), Seller will not directly or indirectly compete (as defined in subsection (ii) of this §5(d) below) with Buyer or its Subsidiaries in any geographic area in which Buyer or any of its Subsidiaries do or have done business, and will not (i) induce or attempt to induce any employee of Buyer or any Subsidiary to leave the employ of Buyer or such Subsidiary or in any was interfere with the relationship between the Company and any employee or independent contractor thereof, (ii) hire directly or through another entity any person who was an employee or independent contractor of Buyer or any Subsidiary of Buyer at any time during the six month period preceding the termination of this Agreement, (iii) induce or attempt to induce any customer, supplier, employee, contractor, licensee, or other business relation of Buyer or any Subsidiary to cease doing business with any of them or in any way interfere with the relationship between any such customer, supplier, employee, contractor, licensee, or business relation and Buyer of such Subsidiary, or (iv) authorize or assist in the taking of any of the foregoing actions by any third party.

(ii)     *Direct and Indirect Competition.* As used herein, the phrase "directly or indirectly compete" shall include owning, managing, operating or controlling, or participating in the ownership, management, operation or control of, or being connected with or having any interest in, as a stockholder, director, officer, employee, contractor, agent, consultant, assistant, instructor, advisor, sole proprietor, partner or otherwise, any business (other than Buyer or its Subsidiaries) which is the same as or competitive with any business conducted or to be conducted by Buyer or any of its Subsidiaries; provided, however, that this prohibition shall not apply to

9

ownership of less than one percent (1%) of the voting stock in companies whose stock is traded on a national securities exchange or in the over-the-counter market.

(d) *Non-Circumvention.* Seller acknowledges and understand that the relationship of Buyer and its Subsidiaries to providers or sources of capital, credit, financing, providers or sources of products or services brokered, sold or resold by Buyer, AFI, or other Subsidiaries of Buyer is confidential and proprietary. Therefore, for the Covenant Period, Seller agrees that neither he, nor any of Seller's employees, agents, or Affiliates and/or successors will directly or indirectly (i) contract with sources or providers of capital, credit, financing, loans, or equity who have worked with Buyer or of any of its Subsidiaries (which includes, for the avoidance of doubt, AFI) during or before the Covenant Period, or (ii) authorize anyone other than Buyer or its authorized agents to act on their to engage any such providers or suppliers. Seller shall promptly refer to Buyer all offers, inquiries and proposals relating to loans, credit, financing, or the provision of services similar to those offered by AFI, Buyer, or any of its Subsidiaries, at all times during the Covenant Period.

(e) *Fuelstream Shares.* Each certificate representing the Fuelstream Shares will be imprinted with a legend substantially in the following form:

> *THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER APPLICABLE SECURITIES LAWS. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND NEITHER THESE SECURITIES NOR ANY INTEREST THEREIN MAY BE TRANSFERRED, SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF A REGISTRATION STATEMENT IN EFFECT WITH RESPECT TO THESE SECURITIES UNDER APPLICABLE SECURITIES LAWS OR AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE COMPANY THAT ANY PROPOSED TRANSFER OR RESALE IS IN COMPLIANCE WITH APPLICABLE SECURITIES LAWS.*

Each holder desiring to transfer any of the Fuelstream Shares first must furnish Buyer with (i) a written opinion satisfactory to Buyer in form and substance from counsel satisfactory to Buyer by reason of experience to the effect that the holder may transfer the Fuelstream Shares as desired without registration under the Securities Act and (ii) a written undertaking executed by the desired transferee satisfactory to Buyer in form and substance agreeing to be bound by the recoupment provisions and the restrictions on transfer contained herein.

(f) *Enforceability.* If any of the provisions of this §5 is held unenforceable, the remaining provisions shall nevertheless remain enforceable, and the court making such determination shall modify, among other things, the scope, duration, or geographic area of this Section to preserve the enforceability hereof to the maximum extent then permitted by law. In addition, the enforceability of this §5 is also subject to the injunctive and other equitable powers of a court as described in §9(e) below.

6. *Conditions to Obligation to Close.*

(a) *Conditions to Buyer's Obligation.* Buyer's obligation to consummate the transactions to be performed by it in connection with the Closing is subject to satisfaction of the following conditions:

(i) the representations and warranties set forth in §3(a) and §4 above shall be true and correct in all material respects at and as of the Closing Date, except to the extent that such representations and warranties are qualified by terms such as "material" and "Material Adverse Effect," in which case such representations and warranties shall be true and correct in all respects at and as of the Closing Date;

(ii) Seller shall have performed and complied with all of its or his covenants hereunder in all material respects through the Closing, except to the extent that such covenants are qualified by terms such as "material" and "Material Adverse Effect," in which case Seller shall have performed and complied with all of such covenants in all respects through the Closing;

(iii) all certificates, documents and agreements specified herein that are required to be delivered to Buyer prior to the Closing have so been delivered;

(iv)    Seller shall have delivered to Buyer a certificate to the effect that each of the conditions specified above in §6(a)(i)-(iii) is satisfied in all respects;

(v)    Buyer is reasonably satisfied that no less than seventy-five (75) days from the Closing Date, Buyer's auditors shall be able to complete and publish consolidated proforma audited financial statements of Buyer and AFI that comply with Form 8-K as set forth under the Securities Exchange Act of 1934.

(vi)    all actions to be taken by the Seller in connection with consummation of the transactions contemplated hereby and all certificates, opinions, instruments, and other documents required to effect the transactions contemplated hereby shall be reasonably satisfactory in form and substance to Buyer; and

(vii)    Seller shall have delivered to Buyer a certificate of the secretary or an assistant secretary of AFI, dated the Closing Date, in form and substance reasonably satisfactory to Buyer, as to no amendments to the (i) Articles of Incorporation of AFI since the date specified on the charter of AFI provided to Buyer; (ii) bylaws of AFI; and (iii) any resolutions of the board of directors or other authorizing body (or a duly authorized committee thereof) of AFI relating to this Agreement and the transactions contemplated hereby.

Buyer may waive any condition specified in this §6(a) if it executes a writing so stating at or prior to the Closing.

(b)    *Conditions to Seller's Obligation.* The obligation of Seller to consummate the transactions to be performed by it in connection with the Closing is subject to satisfaction of the following conditions:

(i)    the representations and warranties set forth in §3(b) above shall be true and correct in all material respects at and as of the Closing Date, except to the extent that such representations and warranties are qualified by terms such as "material" and "Material Adverse Effect," in which case such representations and warranties shall be true and correct in all respects at and as of the Closing Date;

(ii)    Buyer shall have performed and complied with all of its covenants hereunder in all material respects through the Closing, except to the extent that such covenants are qualified by terms such as "material" and "Material Adverse Effect," in which case Buyer shall have performed and complied with all of such covenants in all respects through the Closing;

(iii)    Buyer shall have delivered to Seller a certificate to the effect that each of the conditions specified above in §6(b)(i)-(ii) is satisfied in all respects; and

(iv)    all actions to be taken by Buyer in connection with consummation of the transactions contemplated hereby and all certificates, opinions, instruments, and other documents required to effect the transactions contemplated hereby will be reasonably satisfactory in form and substance to the Seller.

Seller may waive any condition specified in this §6(b) by executing a writing so stating at or prior to the Closing.

7.    *Remedies for Breaches of This Agreement.*

(a)    *Survival of Representations and Warranties.* All of the representations and warranties of the Parties contained in this Agreement shall survive the Closing hereunder and continue in full force and effect forever thereafter (subject to any applicable statutes of limitations).

(b)    *Indemnification.* In the event either Party breaches any of its representations, warranties, and covenants contained herein and, provided that the other Party makes a written claim for indemnification pursuant to §9(h) below within such survival period (if there is an applicable survival period pursuant to §7(a) above), then the breaching Party shall indemnify the other Party from and against the entirety of any Adverse Consequences suffered (including any Adverse Consequences suffered after the end of any applicable survival period) resulting from, arising out of, relating to, in the nature of, or caused by the breach (or the alleged breach).

11

(c)  *Matters Involving Third Parties.*

(i)  If any third party shall notify any Party (the "*Indemnified Party*") with respect to any matter (a "*Third Party Claim*") which may give rise to a claim for indemnification against any other Party (the "*Indemnifying Party*") under this §7, then the Indemnified Party shall promptly notify each Indemnifying Party thereof in writing; *provided, however,* that no delay on the part of the Indemnified Party in notifying any Indemnifying Party shall relieve the Indemnifying Party from any obligation hereunder unless (and then solely to the extent) the Indemnifying Party thereby is prejudiced.

(ii)  Any Indemnifying Party will have the right to defend the Indemnified Party against the Third Party Claim with counsel of its choice reasonably satisfactory to the Indemnified Party so long as (A) the Indemnifying Party notifies the Indemnified Party in writing within 15 days after the Indemnified Party has given notice of the Third Party Claim that the Indemnifying Party will indemnify the Indemnified Party from and against the entirety of any Adverse Consequences the Indemnified Party may suffer resulting from, arising out of, relating to, in the nature of, or caused by the Third Party Claim, (B) the Indemnifying Party provides the Indemnified Party with evidence reasonably acceptable to the Indemnified Party that the Indemnifying Party will have the financial resources to defend against the Third Party Claim and fulfill its indemnification obligations hereunder, (C) the Third Party Claim involves only money damages and does not seek an injunction or other equitable relief, (D) settlement of, or an adverse judgment with respect to, the Third Party Claim is not, in the good faith judgment of the Indemnified Party, likely to establish a precedential custom or practice materially adverse to the continuing business interests or the reputation of the Indemnified Party, and (E) the Indemnifying Party conducts the defense of the Third Party Claim actively and diligently.

(iii)  So long as the Indemnifying Party is conducting the defense of the Third Party Claim in accordance with §7(c)(ii) above, (A) the Indemnified Party may retain separate co-counsel at its sole cost and expense and participate in the defense of the Third Party Claim, (B) the Indemnified Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnifying Party (not to be withheld unreasonably), and (C) the Indemnifying Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnified Party (not to be withheld unreasonably).

(iv)  In the event any of the conditions in §7(c)(ii) above is or becomes unsatisfied, however, (A) the Indemnified Party may defend against, and consent to the entry of any judgment or enter into any settlement with respect to, the Third Party Claim in any manner it reasonably may deem appropriate (and the Indemnified Party need not consult with, or obtain any consent from, any Indemnifying Party in connection therewith), (B) the Indemnifying Parties will reimburse the Indemnified Party promptly and periodically for the costs of defending against the Third Party Claim (including reasonable attorneys' fees and expenses), and (C) the Indemnifying Parties will remain responsible for any Adverse Consequences the Indemnified Party may suffer resulting from, arising out of, relating to, in the nature of, or caused by the Third Party Claim to the fullest extent provided in this §7.

(d)  *Determination of Adverse Consequences.*  The Parties shall take into account the time cost of money (using the Applicable Rate as the discount rate) in determining Adverse Consequences for purposes of this §7.

(e)  *Other Indemnification Provisions.*  The foregoing indemnification provisions are in addition to, and not in derogation of, any statutory, equitable, or common law remedy any Party may have with respect to AFI or the transactions contemplated by this Agreement.

8.  *Tax Matters.*  The following provisions shall govern the allocation of responsibility as between Buyer and Seller for certain tax matters following the Closing Date:

(a)  *Tax Indemnification.*  Seller shall indemnify AFI, Buyer, and each Buyer Affiliate and hold them harmless from and against, any loss, claim, liability, expense, or other damage attributable to

(i) all Taxes (or the non-payment thereof) of AFI or its Predecessor-in-Interest for all Taxable periods ending on or before the Closing Date and the portion through the end of the Closing Date for any Taxable period that includes (but does not end on) the Closing Date ("*Pre-Closing Tax Period*"), (ii) all Taxes of any member of an affiliated, consolidated, combined or unitary group of which AFI or its Predecessor-in-Interest is or was a member on or prior to the Closing Date, and (iii) any and all Taxes of any person (other than AFI) imposed on AFI a transferee or successor, by contract or pursuant to any law, rule, or regulation, which Taxes relate to an event or transaction occurring before the Closing.

(b)     *Straddle Period*. In the case of any Taxable period that includes (but does not end on) the Closing Date (a "*Straddle Period*"), the amount of any Taxes based on or measured by income or receipts of AFI or its Predecessor-in-Interest for the Pre-Closing Tax Period shall be determined based on an interim closing of the books as of the close of business on the Closing Date and the amount of other Taxes of AFI for a Straddle Period which relate to the Pre-Closing Tax Period shall be deemed to be the amount of such Tax for the entire Taxable period multiplied by a fraction the numerator of which is the number of days in the Taxable period ending on the Closing Date and the denominator of which is the number of days in such Straddle Period.

(c)     *Responsibility for Filing Tax Returns*. Buyer shall prepare or caused to be prepared and file or caused to be filed all Tax Returns for AFI which are filed after the Closing Date. Buyer shall permit Seller to review and comment on each such Tax Return described in the preceding sentence prior to filing. Seller shall promptly pay to the Buyer such prorated amount of taxes deemed to be due by AFI during the Straddle Period.

(d)     *Certain Taxes and Fees*. All transfer, documentary, sales, use, stamp, registration and other such Taxes, and all conveyance fees, recording charges and other fees and charges (including any penalties and interest) incurred in connection with consummation of the transactions contemplated by this Agreement shall be paid by Seller when due, and Seller will, at his own expense, file all necessary Tax Returns and other documentation with respect to all such Taxes, fees and charges, and, if required by applicable law, Buyer will, and will cause its Affiliates to, join in the execution of any such Tax Returns and other documentation.

9.     *Miscellaneous*.

(a)     *Press Releases and Public Announcements*. No Party shall issue any press release or make any public announcement relating to the subject matter of this Agreement prior to the Closing without the prior written approval of Buyer and Seller; *provided, however*, that any Party may make any public disclosure it believes in good faith is required by applicable law or any listing or trading agreement concerning its publicly-traded securities (in which case the disclosing Party will use its reasonable best efforts to advise the other Parties prior to making the disclosure).

(b)     *No Third-Party Beneficiaries*. This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

(c)     *Entire Agreement*. This Agreement (including the documents referred to herein) constitutes the entire agreement among the Parties and supersedes any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they relate in any way to the subject matter hereof.

(d)     *Succession and Assignment*. This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns. No Party may assign either this Agreement or any of his or its rights, interests, or obligations hereunder without the prior written approval of Buyer and Seller; *provided, however*, that Buyer may (i) assign any or all of its rights and interests hereunder to one or more of its Affiliates, if any, and (ii) designate one or more of its Affiliates to perform its obligations hereunder (in any or all of which cases Buyer nonetheless shall remain responsible for the performance of all of its obligations hereunder).

(e)     *Equitable Remedies; Specific Performance*. Each Party acknowledges and agrees that the other Parties would be damaged irreparably in the event any provision of this Agreement is not performed in accordance with its specific terms or otherwise is breached, so that a Party shall be entitled to injunctive relief to prevent breaches of this Agreement and to enforce specifically this Agreement and

the terms and provisions hereof in addition to any other remedy to which such Party may be entitled, at law or in equity. In particular, the Parties acknowledge that the business of Buyer and AFI is unique and recognize and affirm that in the event Seller breaches this Agreement, money damages would be inadequate and Buyer would have no adequate remedy at law, so that Buyer shall have the right, in addition to any other rights and remedies existing in its favor, to enforce its rights and the other Parties' obligations hereunder not only by action for damages but also by action for specific performance, injunctive, and/or other equitable relief. The Parties agree that an injunction bond of $100.00 shall be an adequate bond to secure the obligations arising under Florida law in respect to the issuance of any such injunction hereunder.

(f) *Counterparts.* This Agreement may be executed in one or more counterparts (including by means of facsimile), each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

(g) *Headings.* The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

(h) *Notices.* All notices, requests, demands, claims, and other communications hereunder will be in writing. Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient, (ii) one business day after being sent to the recipient by reputable overnight courier service (charges prepaid), (iii) one business day after being sent to the recipient by facsimile transmission or electronic mail, or (iv) four business days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

**If to Seller:**

Attn: Mr. Sean Wagner
510 Shotgun Road, Suite 110
Fort Lauderdale, Florida 33326
T +1 954 423 5345
F +1 954 472 3292
email: *swagner@aviationfuelintl.com*

**If to Buyer:**

Attn: Mr. John D. Thomas
11650 South State Street, Suite 240
Draper, Utah 84020
T +1 801 816 2520
F +1 801 816 2599
email: *jthomas@acadiagrp.com*

Any Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties notice in the manner herein set forth. Such change of address notice shall be effective five (5) business days from the receipt by the receiving party of an electronic transmission thereof or overnight carrier, whichever is earlier.

(i) *Governing Law.* This Agreement shall be governed by and construed in accordance with the domestic laws of the State of Florida without giving effect to any choice or conflict of law provision or rule (whether of the State of Florida or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Florida.

(j) *Amendments and Waivers.* No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by Buyer and Seller. No waiver by any Party of any provision of this Agreement or any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such default, misrepresentation, or breach of warranty or covenant.

(k) *Severability.* Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

(l)     *Expenses.* Each of Buyer, Seller, and AFI will bear his or its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby.

(m)     *Construction.* The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. The word "including" shall mean including without limitation. The Parties intend that each representation, warranty, and covenant contained herein shall have independent significance. If any Party has breached any representation, warranty, or covenant contained herein in any respect, the fact that there exists another representation, warranty, or covenant relating to the same subject matter (regardless of the relative levels of specificity) which the Party has not breached shall not detract from or mitigate the fact that the Party is in breach of the first representation, warranty, or covenant.

(n)     *Submission to Jurisdiction.* Each of the Parties submits to the jurisdiction of any state or federal court sitting in Broward County, Florida, in any action or proceeding arising out of or relating to this Agreement and agrees that all claims in respect of the action or proceeding may be heard and determined in any such court, with the prevailing Party entitled to an award of its reasonable attorneys fees and costs related to such matter.

[end of Stock Purchase Agreement]

15

\* \* \* \* \*

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement in their individual capacity or by their duly authorized representative as of the date first above written.

"Buyer"  "Seller"

FUELSTREAM, INC.

_____  _____
John D. Thomas, Chief Executive Officer  Sean Wagner, individually